**Jayne Ann FORAKER, Appellant–Respondent,**

v.

**Charles Grenvell FORAKER, Respondent–Appellant.**

**Nos. WD 61190, 61407, 61521, 61614.**

Missouri Court of Appeals, Western District.

Jan. 30, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 30, 2004.

As Modified March 30, 2004.

Application for Transfer Denied May 25, 2004.

---

John K. Allinder, Independence, MO, for appellant-respondent.

John W.M. Dennis, Jr., Independence, MO, for respondent-appellant.

Before HARDWICK, P.J., BRECKENRIDGE and SPINDEN, JJ.

PATRICIA BRECKENRIDGE, Judge.

Charles Grenvell Foraker (Husband) appeals from the trial court's Amended Judgment and Second Amended Judgment dissolving his marriage to Jayne Ann Foraker (Wife). Wife cross-appeals from both judgments, and the four appeals are consolidated in this proceeding. In Husband's points on appeal, he asserts that the trial court erred in ordering him to pay the presumed child support amount plus college, automobile and medical expenses; entering a retroactive child support award; failing to give him credit against the retroactive award for moneys paid; awarding Wife a cash payment of $100,000; and inequitably dividing the marital property. In her two points on appeal, Wife claims that the trial court erred in entering a nunc pro tunc order on May 30, 2002, and

in ordering the child support award to be retroactive only to January 1, 2000.

This court finds that there is a valid judgment ordering child support retroactive to January 1, 2000, and there was no error in setting that date. Nor did the trial court err in ordering Husband to pay Wife a cash payment of $100,000 or in dividing the marital property. The court did err, however, in ordering Husband to pay the presumed child support amount in addition to two-thirds of the education, automobile, and medical expenses and in failing to specify the amount of credit Husband is to receive against the retroactive child support award. Accordingly, the judgment is affirmed, in part, and reversed, in part, and remanded for the trial court to establish the amount of child support and to specify the amount of credit Husband is to receive against the retroactive child support award.

## I. Factual and Procedural Background

■ When reviewing a judgment in a dissolution of marriage proceeding, an appellate court reviews the evidence in the light most favorable to the trial court's decision. *Taylor v. Taylor*, 12 S.W.3d 340, 344 (Mo.App.2000). The evidence, in that light, is that Husband and Wife were married on June 26, 1976, and separated on October 19, 1997. They had two children during the marriage, Jenna, born November 14, 1979, and Kyla, born June 10, 1981. Both children were in college at the time of trial.

During the marriage, Husband held administrative positions in school districts in the metropolitan area, and eventually became superintendent of the Raytown School District. Wife worked as a teacher for the first three years of the marriage but quit her job after the parties' first child was born. When Wife quit her job,

the parties decided to cash in her teacher's retirement account because she would not need it, considering Husband's retirement account and their investments. They contributed the money from her retirement account to the purchase of the parties' first marital home. After she left her job, Wife worked primarily as a homemaker and caretaker for the children, while Husband took care of the financial needs of the family. Wife returned to work as a teacher and school counselor in 1989.

In 1992, Wife received a phone call from a man who told her that Husband and his wife, Beth Cook, were having an affair. Ms. Cook worked for a time in the business office of the Raytown School District. Husband denied the affair. In 1995, Wife was devastated when she found out that Husband was, in fact, involved in an affair with Ms. Cook. When Wife confronted Husband, he first denied the affair. When Wife did not believe him, he admitted being with Ms. Cook. Husband told Wife it was a one-time incident, that he was very sorry, and it would never happen again. Wife was willing to try to make the marriage work because she believed Husband's claim that it was "a one-time thing," and she thought that through counseling and "working hard together" they could save their marriage. The parties participated in counseling for about eight months. During this counseling, Wife learned that Husband's affair with Ms. Cook had gone on much longer than Husband had originally told her. Husband had been involved with Ms. Cook for approximately three years. As a result of the counseling, Husband got a cell phone so that Wife could reach him at all times and he provided her with his schedules, so that the parties could rebuild trust. Eventually, the parties privately renewed their wedding vows.

In 1997, Wife learned that Husband was having another extramarital affair when he went away unexpectedly for a four-day weekend. He called her the evening he left and told her that he was with his aunt and uncle. During this call, he told her how much he loved her and that he wanted to make their marriage work. The next day, she called the uncle and asked to speak to Husband, but he was not there. When she next saw Husband, she told him that she believed he was having an affair, and he admitted this was true. The parties separated immediately. After the parties separated, Wife hired a private investigator, who discovered the name and address of the woman with whom Husband was having an affair. The woman was Kimbel Westerson, a co-employee with Husband at Hyman Brand Hebrew Academy. At some point, it was also discovered that Husband had resumed his relationship with Ms. Cook.

Wife filed her petition for dissolution of marriage on October 31, 1997. Husband was allowed to file, out of time, a cross-petition for dissolution of marriage. A trial was held on October 16, 2000, and was continued to November 27, 2000. The trial was postponed for a month for additional discovery due to Husband's failure to initially disclose a corporation he had set up in late 1999, the existence of the corporate bank account, the existence of a personal bank account, and his income for 2000.

The trial court entered its first dissolution judgment on November 26, 2001. In its judgment, the trial court awarded Husband and Wife joint physical custody of the parties' children and named Wife the primary physical custodian. As to child support, the court first determined that Wife had an income of $4,234 per month, and Husband had an income of $10,833 per month. The trial court then ordered Husband to pay child support in the amount of

$1,603 per month for the two children, retroactive to January 1, 2000. Earlier in its findings of facts, the trial court found Husband should pay child support retroactive to December 1, 1997. The trial court also ordered Wife to pay one-third and Husband to pay two-thirds of the children's college expenses. Further, the trial court ordered Husband to pay all of the maintenance, gas, and oil expenses for the children's cars, two-thirds of the children's sorority dues and fees, and two-thirds of the children's car insurance premium costs. Finally, the trial court ordered Wife to maintain health insurance coverage for the children, but ordered Husband to pay two-thirds of any medical costs not covered by the insurance.

With regard to the division of property, the trial court first determined that Wife had nonmarital property worth $434,844, and Husband had nonmarital property worth $1,085,358. The trial court, then, after considering all relevant factors, awarded Wife marital property worth $287,640, and awarded Husband marital property worth $171,202. Included in Husband's award was $75,000 for "cash diverted and concealed by [Husband]." The trial court also ordered Husband to pay the marital debts worth $98,211 and to pay Wife $100,000 "to compensate [Wife] for quitting her job, sacrificing her career, cashing in her retirement and promoting [Husband]'s career." Husband was also ordered to pay $20,000 of Wife's attorney's fees. The trial court denied Wife's request for maintenance, finding that Wife had "sufficient property, including marital property apportioned to her," and income to provide for her reasonable needs.

Subsequently, both Wife and Husband filed motions requesting that the trial court amend its dissolution judgment. On March 11, 2002, the trial court filed its amended judgment of dissolution of marriage. In its amended judgment, the trial court noted that the parties' eldest child, Jenna, was emancipated on November 14, 2001. This was prior to the entry of the court's original judgment of dissolution. As a result, the trial court amended its judgment to add a calculation of presumed child support for only one child. The trial court then ordered Husband to pay $1,603 per month, the amount of presumed child support originally ordered for both Jenna and Kyla, retroactive to January 1, 2000, up to and including November 2001. The trial court further ordered Husband to pay $1,146 per month in child support, the amount calculated for only Kyla, retroactive to December 2001 "and on the 1st day of each month thereafter, until further order of the Court." The trial court added the following sentence to both child support awards: "[Husband] shall be given credit for all child support payments made during this [retroactive] time period against this judgment." The trial court also amended its judgment so its child custody plan and its order regarding college expenses and health insurance would cover only the remaining minor child, Kyla.

The trial court also amended the division of property provisions in the original decree to include additional marital property. The values of three items of property awarded to Wife increased. The value of a Raytown Teacher Credit Union account was increased from $200 to $2070, although another Raytown Credit Union Account of $500 was removed from the list of property awarded to Wife. The value of an American Century Investment 403(b)-Value account was increased from $37,497 to $47,823.87, and the number of shares of Ameren Stock increased from 441 shares to 702.6 shares, with a corresponding increase in value from $13,838 to $28,475. The total value of marital property award-

ed to Wife increased from $287,640 to $313,973.87.

The trial court also increased the award of marital property to Husband in its amended judgment entry. Husband was awarded an American Century 403(b) account worth $97,456.36, so that his total award of marital property increased from $171,202 to $268,658.36. Under the Payment of Debts portion of the decree, Husband was also ordered to pay Wife an additional $20,000 "to accomplish an equitable distribution of property."

On March 20, 2002, Husband filed his first notice of appeal from the amended judgment of dissolution of marriage. On May 21, 2002, Wife filed a motion asking the trial court to correct its amended judgment. Wife noted that there was an inconsistency in the judgment in that the trial court, in its order, awarded retroactive child support to January 1, 2000, but in its finding, stated that the child support should be retroactive to December 1, 1997. She requested that the court correct its judgment to make the order reflect its finding. In response, Husband claimed that the trial court could not correct this inconsistency because he had already filed his notice of appeal. On May 31, 2002, Wife filed her notice of appeal from the amended judgment. On that same day, the trial court entered its second amended judgment of dissolution of marriage nunc pro tunc, in which it changed the date in its finding for retroactive child support from December 1, 1997, to January 1, 2000. In all other respects, the provisions of the second amended judgment nunc pro tunc remained unchanged from those of the amended judgment. On June 11, 2002, Husband filed his notice of appeal from the second amended judgment nunc pro tunc, and, on July 3, 2002, Wife filed her notice of appeal. All of the appeals have been consolidated into this proceeding.

## II. Standard of Review

On appeal of a dissolution proceeding, "[t]his court will review the judgment of the trial court under the standard of review applicable to any other court-tried case." *Eckhoff v. Eckhoff*, 71 S.W.3d 619, 622 (Mo.App.2002). The judgment will be affirmed unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). "The party challenging the dissolution decree has the burden of demonstrating error." *Taylor*, 12 S.W.3d at 344. In its review, the appellate court defers to the trial court's determination of the credibility of witnesses. *David v. David*, 954 S.W.2d 611, 614 (Mo.App.1997).

## III. Wife's Appeal

### A. Valid Judgment Sets Retroactive Date as January 1, 2000

Wife raises two points on appeal. In her first point, Wife asserts that the trial court erred in entering the second amended judgment of dissolution nunc pro tunc because the trial court did not have jurisdiction to change its judgment, as Husband had already filed his first notice of appeal. Specifically, Wife claims that the trial court's second amended judgment was not a proper nunc pro tunc order because it did more than correct a clerical mistake and, therefore, is invalid.

"As a general matter, upon filing of a notice of appeal, a trial court loses almost all jurisdiction over a case." *State ex rel. Stickelber v. Nixon*, 54 S.W.3d 219, 223 (Mo.App.2001). The trial court does retain some jurisdiction over the judgment, however. *Id.* For example, under rule 74.06(a), which codifies the common law order nunc pro tunc, *Lombardo v. Lom-*

*bardo,* 120 S.W.3d 232, 239 (Mo.App.2003), the trial court can still enter nunc pro tunc orders to correct clerical errors:

> Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected with leave of the appellate court.

 The purpose of the nunc pro tunc order " 'is to correct some error or inadvertence in the recording of that which was *actually done,* but which, because of that error or omission was not properly recorded[.]' " *Pirtle v. Cook,* 956 S.W.2d 235, 240 (Mo. banc 1997) (quoting *City of Ferguson v. Nelson,* 438 S.W.2d 249, 253 (Mo.1969)). A nunc pro tunc order " 'may not be used to order that which was *not* actually done, or to change or modify the action which was taken.' " *Id.* (quoting *Nelson,* 438 S.W.2d at 253). A nunc pro tunc amendment " 'does not lie to correct judicial errors, mistakes, or oversights, to create a new record, or to enter a judgment never made or one different from that actually rendered.' " *Henderson v. Fields,* 68 S.W.3d 455, 465 (Mo.App.2001) (quoting *Coon v. Dryden,* 46 S.W.3d 81, 88 (Mo.App.2001)). To determine whether a court's order constitutes a modification of the judgment or simply a nunc pro tunc order, this court must decide whether the "order changes the original judgment or only the record." *Pirtle,* 956 S.W.2d at 242. "[T]he clerical error must be discernible from the record." *Id.* at 243.

Here, the trial court divided its amended judgment of dissolution into "Findings of Facts and Conclusion of Law" and "Judgment Entry." In its findings of fact relating to child support, the court found that the child support award should be retroactive to December 1, 1997. Later, in its "Judgment Entry," the trial court ordered Husband to pay child support retroactive to January 1, 2000. On May 21, 2002, after Husband filed his notice of appeal from the first amended judgment, Wife filed a motion requesting the trial court to correct this inconsistency in its judgment, and order the child support award retroactive to December 1, 1997. In her motion, Wife characterized this inconsistency in the retroactive dates as a "clerical error." On May 30, 2002, the trial court entered its second amended judgment of dissolution of marriage nunc pro tunc, and changed the retroactive date in its findings from December 1, 1997, to January 1, 2000. The effect of this change was to make the finding of the date to which the child support was retroactive consistent with the retroactive date in the order portion of the judgment.

Now, on appeal, Wife claims that the trial court erred in entering the second amended judgment because it was not a proper nunc pro tunc "as it did not correct a clerical error, but changed the judgment." Also, she argues that the trial court was without jurisdiction to enter the nunc pro tunc order because it did not request leave of the appellate court to correct its error as required by Rule 74.06(a). Even if this court were to find that the trial court did not have jurisdiction to enter the nunc pro tunc order because it did not request leave to amend its judgment, however, the child support order would still be retroactive only to January 1, 2000, rather than December 1, 1997, as Wife desires. This is because the inconsistency in the retroactive dates was between the findings of fact and the judgment portion of the divorce decree. While "[a] finding of fact precedes judgment, and constitutes an opinion for the ground of

judgment," it "is not a final determination of the rights of the litigants in the subject matter of the action. Only a judgment is that." *Wilhoit v. Wilhoit,* 599 S.W.2d 74, 78 (Mo.App.1980) (internal citations omitted). Further, if there are inconsistencies between the findings of fact and the judgment, the judgment prevails over the findings of fact. *Casper v. Lee,* 362 Mo. 927, 245 S.W.2d 132, 141 (banc 1952) ("[I]f there is an inconsistency between the recitals and the decretal part of a judgment, an express adjudication controls mere recitals.").

Since the December 1, 1997, retroactive date appears in the findings of fact portion of the dissolution decree, and the January 1, 2000, retroactive date appears in the judgment portion of the dissolution decree, the January 1, 2000, date prevails over the December 1, 1997, date. Therefore, even if the trial court lacked jurisdiction to enter the nunc pro tunc amendment, the amended judgment was a valid judgment establishing that the retroactive date for the child support award is January 1, 2000.

Wife's first point is denied.

### B. No Error in Ordering Child Support Retroactive to January 1, 2000

██ Alternatively, Wife argues, in her second point, that the trial court erred in ordering the child support award retroactive to only January 1, 2000. Specifically, Wife asserts that the trial court abused its discretion in making this award because "the evidence warranted the child support award to be retroactive to December 1, 1997."

██ Under section 452.340.1, RSMo 2000,[1] a trial court may award retroactive child support to the date of the filing of the petition for dissolution of marriage.[2] The trial court has considerable discretion in matters of child support and in making child support awards retroactive, and its judgment will not be reversed absent an abuse of its discretion. *Wenger v. Wenger,* 876 S.W.2d 735, 740 (Mo.App.1994). While retroactive child support is authorized by section 452.340.1, it is not mandatory. *Nelson v. Nelson,* 25 S.W.3d 511, 524 (Mo. App.2000).

Here, Wife claims that the trial court abused its discretion in determining that the appropriate start date for the retroactive child support payments is January 1, 2000. Wife asserts that the correct start date is December 1, 1997, which is one month and one day after the filing of her petition for dissolution of marriage. She states that December 1, 1997, is the appropriate start date "because the analysis of the factors for the period December 1, 1997 through January 1, 2000 is *the same* as the analysis for January 1, 2000 until emancipation."

██ When reviewing the trial court's start date for retroactive child support, this court " 'need not resort to speculation and conjecture in order to fathom what may have been in the mind of the trial judge in determining an appropriate date" for the start of child support payments. *Wenger,* 876 S.W.2d at 741 (quoting *Wexelman v. Donnelly,* 782 S.W.2d 72,

---

1. All statutory references are to the Revised Statutes of Missouri 2000.

2. Section 452.340.1 provides:
 In a proceeding for dissolution of marriage, legal separation or child support, the court may order either or both parents owing a duty of support to a child of the marriage to pay an amount reasonable or necessary for the support of the child, including an award retroactive to the date of filing the petition, without regard to marital misconduct, after considering all relevant factors[.]

76 (Mo.App.1989)). " 'It is the function of the trial judge to "balance the equities" and [this court] will not substitute [its] judgment' " for that of the trial court. *Id.* (quoting *Wexelman,* 782 S.W.2d at 76). Here, the evidence showed that Husband provided Wife with money for child support at the beginning of the parties' separation but stopped paying child support when both of the children entered college. From this evidence, the trial court could have found that Husband met his child support obligations from the time Wife filed her petition for dissolution of marriage in 1997 to the time when both children entered college in 2000, but did not meet it after that point. Therefore, this court cannot say that the trial court abused its discretion in determining that the appropriate start date for the retroactive child support is January 1, 2000.

Wife's second point is denied.

## IV. Husband's Appeal

### A. Error in Basing Child Support on Amount Greater than Demonstrated Need Without Explanation

In his appeal, Husband first alleges error in the trial court's ordering him to pay the presumed child support amount for both children prior to the older child's emancipation, and later for the remaining minor child, plus the children's college expenses, automobile expenses, and non-covered medical expenses. Specifically, Husband argues the child support award was erroneous because it was in excess of the

children's needs; failed to account for the substantial extra support expenses in excess of the presumed child support amount he was ordered to pay; and failed to give him credit for extra payments he was ordered to pay.

To determine child support awards in compliance with section 452.340 and Rule 88.01, trial courts are to follow the two-step procedure set forth in *Woolridge v. Woolridge,* 915 S.W.2d 372, 379 (Mo.App.1996), which was approved by the Supreme Court in *Neal v. Neal,* 941 S.W.2d 501, 504 (Mo. banc 1997). *Ricklefs v. Ricklefs,* 39 S.W.3d 865, 869–70 (Mo. App.2001). In the first step, the trial court "must determine and find for the record" the presumed child support amount under Form 14. *Woolridge,* 915 S.W.2d at 379. In the second step, "the trial court is required to consider whether to rebut the presumed correct child support amount, as found by the court, as being unjust or inappropriate after consideration of all relevant factors." *Id.* " 'The trial court has broad and sound discretion in considering whether to rebut the presumed correct child support amount.' " *Schriner v. Edwards,* 69 S.W.3d 89, 93 (Mo.App.2002) (quoting *Waite v. Waite,* 21 S.W.3d 48, 52 (Mo.App.2000)).

In discussing the child support award in its amended judgment, the trial court stated that it first considered all of the relevant factors, including those listed in section 452.340.1.[3] The court made detailed findings regarding each statutory factor.

---

3. These factors are:
 (1) The financial needs and resources of the child;
 (2) The financial resources and needs of the parents;
 (3) The standard of living the child would have enjoyed had the marriage not been dissolved;
 (4) The physical and emotional condition of the child, and the child's educational needs;

 (5) The child's physical and legal custody arrangements, including the amount of time the child spends with each parent and the reasonable expenses associated with the custody or visitation arrangements; and
 (6) The reasonable work-related child care expenses of each parent.

The trial court then rejected both parties' Form 14 calculations, and prepared its own Form 14.

In preparing its own Form 14, the trial court determined that Wife's monthly income was $4,234 and Husband's monthly income was $10,833, which made a combined monthly gross income of $15,067. The trial court next determined, based on the parties' combined monthly gross income and the Schedule of Basic Child Support Obligations for Form 14, that the basic child support amount was $1,420 for one child and $2,055 for two children. The trial court then added $174 to the basic child support amount for health insurance costs, which made the total combined child support costs $1,594 for one child and $2,229 for two children. Because Husband's proportionate share of the parties' combined monthly gross income was 71.9%, the court found that the presumed correct child support amount Husband should pay was $1,146 for one child and $1,603 for two children. The trial court further noted that "after consideration of all relevant factors, the Court finds that its calculation of presumed correct child support has not been rebutted as being unjust or inappropriate." The court ordered Husband to pay $1,603 per month in retroactive child support for both children, from January 1, 2000 to November 1, 2001, when the older child was emancipated; and $1,146 per month for the remaining minor child from December 1, 2001, forward.

The court then found that the children had extraordinary educational expenses. The court expressly stated that it was addressing these expenses outside of the monthly child support obligation and had not included them in the court's calculation of the presumed child support amount. With regard to these expenses, the court found that the parties had agreed that Husband would pay two-thirds of the children's college expenses, while Wife would pay one-third. Thus, the court ordered Husband to pay two-thirds of the children's actual expenses for tuition, room, board, and fees; and two-thirds of their sorority expenses. The court also ordered Husband to pay the children's "related living expenses," including 100% of the gas and oil expenses for the children's cars, and 100% of the maintenance expenses for the children's cars. Additionally, the court ordered Husband to pay two-thirds of the children's annual automobile insurance costs remaining after the children each pay $300 toward the premiums, and two-thirds of their non-covered medical expenses, while Wife is to pay one-third of these expenses.

▇▇▇ Husband first argues that the court erred in ordering him to pay the presumed child support amount because the evidence showed that the amount is in excess of the children's needs. Specifically, Husband contends that when the extra expenses for the children's college, automobiles, and non-covered medical expenses are not included in considering the propriety of the presumed child support amount, since the court expressly stated that those expenses were to be addressed outside of the monthly child support award, the children's needs outside of those extra expenses are far less than the presumed child support amount.

Husband bases his argument on the expense amounts listed in Wife's statement of income and expenses, and Wife's testimony about the statement. In the statement, Wife listed the expenses she incurs when the children are with her. When the children's extra expenses are excluded, Wife's statement of income and expenses indicates that her monthly expenses for both children are $1,024.39. Wife failed to include the $174 monthly cost of the chil-

dren's health insurance on her statement of income and expenses, so when that cost is added to $1,024.39, the children's total monthly expenses are $1,198.39. This amount is substantially less than the parents' combined child support costs of $2,229 for both children, as calculated and relied upon by the trial court to determine Husband's child support obligation for both children. In fact, Wife's listed expenses of $1,198.39 for both children are far less than the parents' combined child support costs of $1,594 for one child, which again were calculated and relied upon by the trial court to determine Husband's child support obligation for one child.

 While evidence from the custodial parent that the children's "financial need is lower than the parents' combined child support costs or expenses established by Form 14 rebuts the [presumed child support amount], it does not mandate that the award be based on the lower amount." *Honderick v. Honderick,* 984 S.W.2d 205, 212 (Mo.App.1999). If the trial court bases its award on the higher amount, however, the court "must cite factors supporting the award based on the higher amount, and it is an abuse of discretion not to do so." *Id.*

In this case, Wife's own income and expense statement showed her expenses for both children were significantly less than the parents' combined child support costs on Form 14 not only for two children, but even for one child. The trial court stated in its order that, "[a]fter consideration of all relevant factors," the Form 14 presumed child support amount was "fair and reasonable," and "ha[d] not been rebutted as being unjust and inappropriate." Yet, the court did not cite any specific factors to support a child support award

based on the calculated combined child support costs that were greater than the children's actual expenses, as demonstrated by Wife's own evidence. *See id.*

Therefore, the trial court's child support award, for two children prior to the older child's emancipation and for one child after that time, constituted an abuse of discretion. *Id.* This court is required to remand the award to the trial court for a determination of Husband's reasonable child support obligation, for one and two children, based on the children's demonstrated need and other relevant factors required by Rule 88.01. *Id.*[4]

 Although this court is reversing and remanding the child support award, this court will address Husband's other arguments in this point, as they are likely to recur on remand. Husband claims that, because he was ordered to pay a portion of the children's extra expenses outside of his monthly child support obligation, he either should not have to pay monthly child support or should receive a credit against his monthly support obligation for these extra expenses he was ordered to pay. Husband does not question the propriety of the court's ordering him to pay the extra expenses but, rather, questions the propriety of the court's requiring him to pay monthly support in addition to those expenses. Husband claims that "[t]he proper finding would have been that the presumed correct child support was rebutted as being unjust and inappropriate" because Husband was paying these extra expenses "while the children were living elsewhere most of the time" and "that to order the presumed correct child support amount would result in the Husband paying the children's living expenses twice."

---

4. Because the older child became emancipated after trial but while the case was under advisement, there was no evidence as to the expenses Wife incurs for only the remaining minor child. Evidence on this issue may be presented on remand.

When the trial court orders a parent to pay a portion of non-covered or extraordinary medical expenses and extraordinary post-secondary educational expenses in a separate order outside of the Form 14 presumed child support amount, the trial court is not required to find that the presumed child support amount is unjust or inappropriate and is, therefore, rebutted by the extraordinary expenses. *See* Directions, Comments for Use and Examples for Completion of Form No. 14, Line 6d, Comment A, Caveat, and Line 6e, Comment A, Caveat. Instead, the court can simply order the parent to pay both the presumed child support amount and the portion of the extraordinary expenses if the trial court determines, in its discretion, that such an award is appropriate based upon all relevant factors, including the financial needs and resources of the parents and the children. *See Ricklefs*, 39 S.W.3d at 878. The child support award in such situations must not include a redundancy in the children's living expenses already, and must otherwise be just and reasonable. *Gordon v. Gordon*, 924 S.W.2d 529, 536 (Mo.App.1996).

Husband's contention that the order of monthly child support in addition to the order of extra expenses results in a redundancy in the children's living expenses is not supported by the record. In its amended judgment, the trial court expressly stated that it did not include the extra expenses in calculating the Form 14 presumed child support amount. Moreover, at trial, Wife was asked whether the expenses she listed on her income and expenses statement for the children decrease when the children are at college, and she testified that the amounts on the statement are her expenditures even considering the periods the children are away. The children live primarily with Wife when they come home from college on weekends and in the summer. That Wife continues to incur expenses at her residence for the children while they attend college is supported by the evidence. The court's requiring Husband to pay his proportionate share of those expenses, which are not duplicative of the extra expenses, does not constitute an abuse of discretion.

## B. Error in Not Specifying Amount of Credit Towards Retroactive Child Support Award

In his second and third points on appeal, Husband claims that the trial court erred in ordering retroactive child support. In his second point, Husband initially claims that the trial court erred in ordering him to pay retroactive child support because retroactive child support "was not at issue nor requested in trial." While "[r]etroactive child support does not have to be prayed for specifically in the petition," the award is appropriate only if it " 'is consistent with the substantive allegations of the petition, is requested on the record, and supported by the evidence.' " *Nelson*, 25 S.W.3d at 524 (quoting *In re Marriage of Gerhard*, 985 S.W.2d 927, 935 (Mo.App.1999)). The record, here, reveals that *Husband* requested the payment of retroactive child support in his August 21, 1998, cross-petition for dissolution of marriage. In his cross-petition, Husband alleged that "[t]he minor children will require child support from the Petitioner and the Respondent pursuant to Supreme Court Rule 88.01." Husband then prayed for "[a] Judgment of the Court directing *one or both of the parties* to pay a fair and reasonable sum as and for child support *retroactive* to the date of filing of this Cross–Petition on behalf of the minor children pursuant to Supreme Court Rule 88.01." (Emphasis added.) Husband's allegation that the children would require support from both parties and his request that "one or both of the parties" pay retro-

active child support were sufficient to raise the issue of whether he should have to do so. Notably, there was significant evidence presented at trial as to the financial support Husband had provided to the children during the parties' separation. Such evidence was relevant only to the issue of retroactive child support.

Husband's other claim in his second point is that the trial court's award of retroactive child support is "arbitrary and unreasonable" because he "more than met his financial responsibilities during the pendency of the case." This court's reversal and remand of the monthly child support award, as discussed in Husband's first point, necessarily affects the amount of retroactive child support Husband will be ordered to pay. Without knowing the amount of retroactive child support the trial court will order Husband to pay, this court cannot determine whether the award is "arbitrary and unreasonable." Moreover, our resolution of Husband's third point, discussed below, further precludes this court from reviewing the reasonableness of the retroactive child support award.

 In his third point, Husband contends that the amount of the retroactive child support award is unclear because the trial court failed to specify how much credit he is to receive for child support payments he made during the parties' separation. In its first and second amended judgments, the trial court ordered Husband to pay child support for both children "retroactive to the 1st day of January, 2000, and on the 1st day of each month thereafter, to and including the month of November, 2001." The trial court also ordered Husband to pay child support for the remaining minor child, after the older child's emancipation, "retroactive to the 1st day of December, 2001, and on the 1st day of each month thereafter, until further

order of the Court." The retroactive child support award provides that Husband "shall be given credit for all child support payments made during this time period against this judgment."

 Husband claims that the trial court erred in failing to specify the amount of the credit he is to receive against the retroactive child support payments. "A party is entitled to receive credit against the retroactive award of temporary support for the voluntary amounts paid to the child between the time of separation and the time of trial." *Halupa v. Halupa*, 980 S.W.2d 325, 328 (Mo.App.1998). It is unclear from the trial court's judgment, however, how much credit the trial court intended Husband to receive for voluntary payments made during the pendency of the case. The only finding the court made on this issue was that "[d]uring the pendency of this proceeding, [Husband] has contributed funds for the support needs of the parties' children, but has contributed less than he should have. Retroactive child support is proper under the facts of this case." Since the amount of Husband's credit is uncertain, the total amount of retroactive child support Husband must pay is also uncertain. "Generally, a judgment must be definite and certain to be enforceable." *DeCapo v. DeCapo*, 915 S.W.2d 343, 347 (Mo.App.1996). Therefore, because the amount of the retroactive child support Husband must pay is uncertain, the award is reversed and remanded for the trial court to specifically determine the amount of credit Husband is to receive against the entire retroactive child support award. *Morton v. Myers*, 21 S.W.3d 99, 108 (Mo.App.2000).

### C. No Error in Dividing Marital Property

In two of his points, Husband asserts that the trial court erred in dividing the

marital property. Husband first claims that the trial court erred in awarding Wife a $100,000 cash payment to "compensate" her "for quitting her job, sacrificing her career, cashing in her retirement and promoting [Husband]'s career." He argues that the conduct that the court considered in awarding $100,000 to Wife was included in the factors the court considered in dividing the parties' marital property, so Wife's conduct was rewarded twice. He further argues that the evidence at trial did not include values for Wife's services, so there is no evidence to support the amount of $100,000. Husband asserts that, in awarding Wife $100,000, the trial court was attempting to compensate her for his teacher's retirement. In his other point challenging the division of property, Husband claims that the division of marital property, in its entirety, is erroneous because it is "grossly disproportionate," with Husband receiving significantly less of the value of the marital assets than Wife.

 In a proceeding for division of property, the trial court is required to make an equitable division of the parties' marital property after considering all relevant factors. Section 452.330.1; *Hernandez v. Hernandez*, 872 S.W.2d 161, 166 (Mo.App.1994). The trial court has substantial discretion in dividing marital property, and appellate courts will not interfere unless the division is so heavily weighted in favor of one party to amount to an abuse of discretion. *Hutcherson v. Hutcherson*, 909 S.W.2d 403, 406 (Mo.App.1995). The trial court abuses its discretion only if its "ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Wright v. Wright*, 1 S.W.3d 52, 57 (Mo.App.1999). This court presumes that the trial court's division of marital property is correct. *Tate v. Tate*, 920 S.W.2d 98, 103 (Mo.App.1996). On appeal, the party challenging the division has the burden of overcoming this presumption. *Id.*

 The trial court is not required to divide marital property equally between the parties. *Carter v. Carter*, 940 S.W.2d 12, 16 (Mo.App.1997). The division must only be fair and equitable, and "this court routinely affirms highly disproportionate divisions of marital property." *Nelson*, 25 S.W.3d at 517. In making such a division, the court is to consider "all relevant factors," including:

(1) The economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children;

(2) The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker;

(3) The value of the nonmarital property set apart to each spouse;

(4) The conduct of the parties during the marriage; and

(5) Custodial arrangements for minor children.

Section 452.330.1. "Disparity in the value of marital property awarded each spouse is appropriate if the relevant factors, statutory or otherwise, justify an unequal division." *In re Marriage of Betz*, 880 S.W.2d 618, 623 (Mo.App.1994). It is not a per se abuse of discretion for the trial court to award one spouse a disproportionate percentage of the marital property. *Id.*

In dividing the marital property, here, the judgment recites that the trial court first considered all of the relevant factors, including, "but not limited to," those listed

in section 452.330.1. The trial court then made specific factual findings regarding each of the statutory factors. Next, the trial court weighed each factor, and determined that they weighed in favor of an equitable, but not equal, division of property, with Wife receiving a higher percentage of the marital assets. After weighing the relevant factors, the trial court awarded Wife marital assets worth $313,973.87 and awarded Husband martial assets worth $268,658.36 and debts of $98,211, for a total of $170,447.36. The trial then ordered Husband to pay Wife lump sums of $100,000 and $20,000. As a result of these orders, Wife received approximately 90% of the marital assets and Husband received approximately 10% of the marital assets.

■ In his claims that the division of property is erroneous, Husband first challenges the trial court's order that he pay Wife $100,000. The award of this sum of money was made upon the request of Wife. At trial, Wife asked the trial court to order Husband to pay her "a lump sum amount of money" in addition to the division of marital property. Wife stated that she wanted the trial court to award her "$100,-000 to compensate [her] for the ten years at home. That would allow [her] to do some investing towards retirement." In its judgment, the trial court, after dividing the parties' marital property, ordered Husband to pay Wife $100,000 "to compensate [her] for quitting her job, sacrificing her career, cashing in her retirement and promoting [Husband]'s career." The trial court entered this order in the "Payment of Debts" section of its judgment, and not in the property division section of the judgment. Husband claims that this award was erroneous because the trial court already considered Wife's actions in its division of marital property and there was no evidentiary basis for the amount of the order. He also argues that the award was a method of compensating Wife for his nonmarital teacher's retirement.

■ A trial court may order one spouse to pay the other spouse a set amount of money, even if it creates an unequal division of property, as long as the award is supported by the evidence. *See Holt v. Holt*, 976 S.W.2d 25, 28 (Mo.App. 1998); *Jensen v. Jensen*, 877 S.W.2d 131, 135–36 (Mo.App.1994); *Scott v. Scott*, 645 S.W.2d 193, 197 (Mo.App.1982). In its award to Wife of $100,000, the trial court's use of the term "compensation" is the basis of Husband's claim that it appears the trial court was considering Wife's actions twice, i.e., once in the division of marital property and once through this cash award. The trial court, however, was allowed to give Wife a cash award when it was dividing the marital property, and this court is more concerned with the substance rather than the form of the judgment. *Bus. Men's Assurance Co. v. Graham*, 984 S.W.2d 501, 506 (Mo. banc 1999). This court's primary concern is "with the correctness of the trial court's result, not the route taken by the trial court to reach that result." *Id.* This court will affirm the judgment if it is "cognizable under any theory, regardless of whether the reasons advanced by the trial court are wrong or not sufficient." *Id.* Since the trial court had the authority to order Husband to pay Wife a set amount of money in dividing the marital property, it was not error for the trial court to do so.

Husband next challenges the amount of the $100,000 award, claiming that there was no evidence to support such amount. He asserts that since there was no evidence of the value of Wife's services during the marriage, there was no evidence to support a determination that those services were worth $100,000. His claim is based on cases decided under the "source

of funds" rule, where it is required that there be evidence of the services provided by a spouse that are claimed to be marital sweat-equity contributions to nonmarital property. *See Hoffmann v. Hoffmann*, 676 S.W.2d 817, 826 (Mo. banc 1984); *Klaus v. Klaus*, 918 S.W.2d 407, 409 (Mo. App.1996); *Barnes v. Barnes*, 903 S.W.2d 211, 214 (Mo.App.1995); *Knapp v. Knapp*, 874 S.W.2d 520, 524 (Mo.App.1994). Wife is not a spouse claiming a marital interest in nonmarital property, however, so the source of funds rule and the cases Husband cites are not applicable. The trial court can properly make a cash award to Wife in the division of marital property, and it is within the discretion of the trial court to set the amount of any monetary award to a spouse to accomplish an equitable division of the marital property. *See Jensen*, 877 S.W.2d at 135–36; *Scott*, 645 S.W.2d at 197. The question of whether the trial court abused that discretion is part of the review of the division of property, as a whole.

■ Husband does challenge the division of marital property, as a whole, claiming it is inequitable. Husband admits that the trial court considered each statutory factor in dividing the marital property, but he claims "[t]he fact that the trial court addressed each statutory factor in its findings does not ensure that proper judicial consideration was made and that the division was not unreasonable." In his argument that the division is inequitable, Husband raises four specific claims of error. Husband first claims that the division of property was a veiled attempt to give Wife a portion of his teacher's retirement, which was not subject to division by the trial court. He next asserts that there was no evidence to support the trial court awarding him $75,000 as the amount the trial court found was diverted or concealed by him. He then claims that the orders that he pay Wife the total lump sum of $120,000 in the division of property and $20,000 in attorney's fees are inequitable because he is left with a negative award of property. In his last claim, he asserts that there is no substantial evidence to justify the grossly disproportionate division of marital property.[5]

■ In challenging the division of property, Husband asserts that there is an additional reason the trial court erred in ordering Husband to pay Wife $100,000. He argues the order shows the trial court's "sense of vexation ... in being required to set aside the Husband's teacher's retirement to him as non-marital property." He argues that such order is a "veiled attempt" to award Wife a portion of his

---

5. In Husband's point relied on, he also asserts that one of the reasons the division of property was erroneous was that he received only $75,447 in tangible assets. That claim is not discussed in the argument portion of his brief and will be considered abandoned. *Luft v. Schoenhoff*, 935 S.W.2d 685, 687 (Mo.App. 1996). In the argument portion of his brief, he raises the additional claim that the trial court's division of property was contrary to its express intention to distribute approximately 63% of the marital assets to Wife and 37% to Husband. Since this claim was not raised in a point relied on, it need not be considered. *Lewis v. Dep't of Soc. Servs.*, 61 S.W.3d 248, 255 n. 2 (Mo.App.2001). Nevertheless, the claim is meritless. While it may have been the court's original intention to distribute the marital assets, exclusive of the cash payment, in these percentages, these percentages were no longer accurate when the court entered its amended judgment distributing additional assets. In any event, the distribution language in the order portion of the judgment controls over any inconsistent language in the findings. " '[W]hen a conflict exists within the text of a court order, the portion of the order wherein the court gives its imprimatur or exercises its power trumps inconsistent language appearing elsewhere in the order.' " *Harris v. Desisto*, 932 S.W.2d 435, 447 (Mo. App.1996) (citation omitted).

teacher's retirement account, which the trial court is not allowed to do.

 Teacher retirement accounts, like Social Security benefits, cannot be divided in a dissolution proceeding. *In re Marriage of Woodson*, 92 S.W.3d 780, 783 (Mo. banc 2003). Instead, teacher's retirement benefits must be classified as nonmarital property and, while the trial court "must consider the value of nonmarital property before equitably dividing the marital property," it "may not consider the nonmarital property to such an extent that it has a substantial material impact on the overall division of marital property."[6] *Id.* at 785. Yet, " 'the benefits or potential benefits' " from the teacher's retirement account " 'are economic factors to be considered, along with other factors in the disposition of property[.]' " *Holt*, 976 S.W.2d at 29 (citations omitted).

Here, the trial court determined that Husband has a teacher's retirement account worth $918,589, $578,589 of which was accrued during the marriage. The trial court first noted that, under Missouri case law, it is entitled to consider the teacher's retirement, but cannot let it "materially impact" its division of property. It

then stated that it "has not incorporated a setoff, or otherwise attempted to divide [Husband]'s teacher retirement asset in this Judgment, because the current state of the law does not permit the Court to do so." The court went on to say that "[t]he Judgment of this Court would be radically different if it could divide the [Husband]'s teacher retirement asset." Contrary to Husband's argument, these statements show that the trial court clearly understood that it could not let Husband's teacher's retirement account materially affect its division of property, and it was not going to do so.

In addition, the trial court's discussion of the statutory factors it considered in dividing the marital property shows that it did not allow Husband's teacher's retirement account to materially impact its division of property. Although the trial court mentioned Husband's teacher's retirement account in discussing the economic circumstances of each spouse and the value of each party's nonmarital property, it also looked at the other evidence to make its distribution. It considered Husband's "significantly greater income and earning capacity"; the desirability of awarding

**6.** In support of the principle that the trial court cannot let a teacher's retirement account have a "substantial material impact on the overall division of marital property," the Supreme Court cites *DeMayo v. DeMayo*, 9 S.W.3d 736, 741 (Mo.App.2000). *Woodson*, 92 S.W.3d at 785. In *DeMayo*, this court held, quoting *David*, 954 S.W.2d at 616, another case from this court, " 'in the case of teacher retirement accounts, the court is not to permit the consideration of the retirement account to "materially impact" the division of property.' " *DeMayo*, 9 S.W.3d at 740. The court in *David* relied on *Mallams v. Mallams*, 861 S.W.2d 822 (Mo.App.1993), to reach this conclusion. In reaching this conclusion, however, it appears that the court in *David* misinterpreted the holding of *Mallams*. In *Mallams*, this court dealt with the issue of a trial court that erroneously treated a teacher's

retirement account as *marital property* in the division of property. 861 S.W.2d at 824. The court held that this error "materially impacts the division of property" and required that the judgment be reversed. *Id.* at 825. *Mallams* did not deal with what effect a teacher's retirement account can have on the division of marital property when it is properly characterized as nonmarital property by the trial court. Thus, it appears that this court incorrectly interpreted *Mallams* by holding, in *David*, that a teacher's retirement account must *never* "materially impact" the division of marital property even when it is properly characterized as nonmarital property. Nevertheless, this court is required to follow the last decision on this issue handed down by the Supreme Court. *Kansas Ass'n of Private Investigators v. Mulvihill*, 35 S.W.3d 425, 432 (Mo.App.2000).

Wife the marital home so she "can continue to provide the children with a home, in a neighborhood where they have grown up" and "prospered"; both party's substantial contributions to the acquisition of marital property, Wife as a homemaker and Husband from his income; each party's nonmarital property besides the teacher's retirement account; Husband's "significant marital misconduct" that "placed an undue financial burden on the marriage"; and Wife's lack of misconduct. Thus, the trial court considered all of the evidence, and did not improperly consider Husband's teacher's retirement account, in concluding that the statutory factors weighed in favor of an unequal, but equitable, distribution of marital property with Wife receiving more assets.

 Husband next contends that the award of marital property is erroneous because there was no evidence to support awarding Husband $75,000 as "cash diverted and concealed" by him. He asserts that there is no evidence that the Waddell & Reed account was worth $75,000, or that he had the account under his management. "[A] trial court may order reimbursement of squandered or secreted marital property or include such assets as part of the marital property." *In re Marriage of Thomas*, 21 S.W.3d 168, 173 (Mo.App. 2000). "[T]he trial court enjoys broad discretion in making determinations on issues relating to the squandering of assets, because it is in the better position to judge credibility." *Heslop v. Heslop*, 967 S.W.2d 249, 255 (Mo.App.1998). Nevertheless, "[t]he party alleging that another party squandered property must present evidence of it or no finding of squandering or reimbursement will result." *Lawrence v. Lawrence*, 938 S.W.2d 333, 338 (Mo.App. 1997). Husband argues that this award was erroneous because there is no evi-

dence "to support a finding that Husband diverted and concealed this $75,000."

The record does not indicate that either party requested findings of fact and conclusions of law on any issues, including the squandering of specific marital assets. "Where no specific findings are requested, the appellate court presumes that the trial court resolved all factual issues in accordance with the result reached." Rule 73.01(c); *Henning v. Henning*, 72 S.W.3d 241, 247 (Mo.App.2002). Reviewing the record in accordance with the result reached, there is ample evidence to support the trial court's finding that Husband concealed and diverted at least $75,000 worth of marital property, including, but not limited to, funds in the Waddell & Reed account. The evidence showed that the parties jointly held the Waddell & Reed account during their marriage. Wife admitted into evidence checks written from the parties' joint bank accounts to the Waddell & Reed account, which totaled $49,483. At the time of trial, however, there was no money left in the Waddell & Reed account. Wife testified that she had "no idea" what happened to the money in the Waddell & Reed account and, at the time of separation, she did not have access to the Waddell & Reed account. She further stated that the account required two signatures and Husband had access to the account during the separation because she "had left him a check with my signature on it so he could get money out."

Husband, on cross-examination, agreed that the parties regularly put money from their joint bank accounts into the Waddell & Reed account, and the account no longer had money in it. Husband testified that he often moved money from the Waddell & Reed account to other money market funds and bonds, but when questioned about what specifically happened to the

Waddell & Reed money, Husband could not give a definite answer:

Q. What happened to all this Waddell & Reed money?

A. I believe it was rolled over into American Century.

Q. Wait a minute. Which account? Would you show me which one?

A. Oh, I don't remember.

Q. That's why we're having trouble here, Mr. Foraker. Which of these American Century accounts that you're claiming to be nonmarital did you roll that Waddell & Reed money into?

A. No. I'm not claiming that Waddell & Reed would be nonmarital.

Q. Well, which American Century account did you roll it over into?

A. I don't recall. I would have to look at the checks.

Later, when asked again about what happened to the Waddell & Reed money, Husband answered, "I don't remember what happened to the Waddell & Reed money," and "I don't know. The Waddell & Reed account was closed." The account was closed after the date of the parties' separation. While Husband presented evidence to trace the nonmarital origin of other funds withdrawn from the parties' joint accounts, he made no attempt to trace the funds from the Waddell & Reed account. The evidence was sufficient to show that Husband had control of the Waddell & Reed account, he removed all of the funds from the account, and he could not account for any of those funds.

In addition to the evidence regarding the disappearance of the money in the Waddell & Reed account, Wife also presented evidence that, during the separation, Husband routinely took money out of two joint bank accounts, one at Bank of Grain Valley and one at Bank of America. He withdrew cash from these accounts at a rate of $1,500 to $2,000 a month, for a total of $75,000. Husband admitted that he took cash out of the accounts at this rate during the separation, but testified that he used this money to pay for his living expenses. The trial court, however, was not required to believe this testimony. *Heslop*, 967 S.W.2d at 255. Wife also presented evidence that, during the separation, Husband moved money from their marital accounts into accounts that he claimed were nonmarital. Finally, there was evidence that Husband desired to secret income and assets during the dissolution proceeding, in that he admitted that he intentionally did not disclose the existence of a corporation, two bank accounts and $49,300 of income. Thus, there was sufficient evidence from which the trial court could have found that Husband was squandering or secreting marital assets, and it did not abuse its discretion in awarding Husband $75,000 as "cash diverted and concealed" by him.

 Husband's final two claims are that the distribution of property is erroneous because it results in a negative award of marital property to him, and there was no substantial evidence, under the factors in section 452.330, to support such a grossly disproportionate division of property.

 First, the division of property does not result in a negative award to Husband. In arriving at a negative total, Husband considers the award of $75,000 which he secreted or concealed and the $20,000 awarded to Wife for her attorney's fees. As discussed previously, there award of $75,000 was supported by the evidence and is properly considered as property Husband receives. Additionally, an award of attorney's fees is not part of the division of marital property and should

not be considered in examining the propriety of the division.[7]

■ In considering Husband's claim that there was no substantial evidence to support the trial court's division of property, the evidence was that the parties were married for twenty-five years. During the first five years of the marriage, Wife taught school. The parties agreed that she should quit teaching after the parties' first child was born. Thus, by agreement, Wife sacrificed her career and teacher's retirement to care for the parties' children and support Husband's career. *See Jensen,* 877 S.W.2d at 135. During the marriage, Wife's support was important to Husband's success in his career and benefited him both in attaining his advancement to the position of school superintendent and in performing that job.

The parties further agreed that, after Wife left teaching, she should cash in the retirement that she had acquired from teaching and use the funds toward the purchase of their first home. The present cost to purchase the retirement that the parties withdrew in the 1970s is $24,147.28. The parties' rationale for cashing in Wife's retirement was that Husband would accumulate a much larger retirement account, and his skill in investing the parties' savings would adequately provide for Husband and Wife in their retirement. In fact, Husband's retirement account at the time of the dissolution was substantial, valued at $918,512, and would have comfortably supported the parties in their retirement. *See Holt,* 976 S.W.2d at 28 (holding that while teacher's retirement accounts cannot be considered marital property, a trial court can use the benefits as an economic factor to be weighed in dividing the marital property).

The evidence also showed that Husband had a greater earning potential than Wife. Wife earned $4,234 per month. While the parties were together, Wife contributed approximately $800 per month to her 403(b) retirement account. After the parties separated, however, Wife required those funds for her support. There is little likelihood that Wife could accumulate funds from her income to support her during retirement. On the other hand, Husband's income from his retirement and consulting was $10,833 per month. He had earned over $10,000 per month for each of the three years preceding the dissolution hearing. He admitted that, during this time, he had $30,000 to $40,000 of excess income after expenses. Husband also testified that, after his retirement as superintendent of the Raytown School District at the age of fifty-four, he intended to acquire sufficient Social Security credits so that he would qualify for Medicare benefits at retirement age.

Husband's actions subsequent to the separation demonstrate that he had more than sufficient funds to provide for himself. Right after the separation, he purchased a new Chrysler Concord automobile. He also purchased a new Harley Davidson motorcyle. The new motorcycle's purchase price of $23,250 was $7,750 greater than the $15,500 trade-in he received on his original Harley motorcycle. A few months before the dissolution hearings, Husband spent $55,000 to buy a building lot. He then contracted for and began to construct a new home for himself. The home, according to the contract, would cost up to

---

7. Husband does not challenge the award of attorney's fees to Wife. Any challenge would have been meritless. The trial court's award of attorney's fees was clearly appropriate in light of the evidence at trial of Husband's conduct in causing the dissolution, his false testimony in discovery depositions, his failure to disclose assets and income, and his greater income and nonmarital assets. *See* section 452.355.1; *Taylor,* 12 S.W.3d at 348.

$300,000.[8] Husband testified that he intended to finance only about $100,000 of the cost of the home and would pay for the balance from nonmarital and marital investments.

It is true that the net property award to Husband was reduced by the $98,211 of debt he was ordered to pay. Of that amount, however, $23,000 of the Raytown Credit Union home equity mortgage on the marital residence was borrowed to make a loan to Husband's daughter by his first marriage and her husband. An additional $4,000 of that debt was withdrawn by Husband during the separation. Likewise, $14,105 of the debt was for the Chrysler Concord he purchased during the separation, and $13,191 was for Husband's Harley Davidson VISA Account, which he incurred during the separation and which included the $7,750 debt for the purchase of Husband's new motorcycle. Additionally, $2,733 of the debt Husband was ordered to pay was for a new vehicle Husband purchased for one of his daughters during the separation. The court's ordering Husband to pay these debts, many of which were incurred primarily for his benefit, was reasonable and appropriate under the circumstances.

Moreover, as noted previously, there was evidence that Husband was guilty of significant misconduct during the marriage. *See Jensen*, 877 S.W.2d at 135. His adulterous conduct substantially burdened the marriage financially and burdened Wife emotionally. Husband had sexual relations with three women during the marriage, one affair lasting three years. He repeatedly denied any adulterous behavior, until Wife could prove otherwise. After Wife learned about his affair with Ms. Cook, Wife forgave him, and the couple spent eight months in counseling to save the marriage. Husband led Wife to

believe that the efforts were successful, as evidenced by the fact that the parties renewed their wedding vows. Husband then continued his adulterous behavior and caused the break up of the marriage. His affair with Ms. Westerson was the cause of the separation. At trial, he admitted that he had resumed his relationship with Ms. Cook.

A consideration of the factors contained in section 452.330.1 overwhelmingly supports the trial court's division of marital property. This was a twenty-five year marriage. After the birth of their first child, the parties agreed to cash in Wife's teacher's retirement account, and they agreed that Wife would forego her career to stay home, raise the parties' children, and support Husband's career. In doing so, the parties essentially agreed that Wife's future financial security would depend upon Husband. As a result of this arrangement, Husband's career thrived, so much so that at the time of trial, there was a significant disparity between Husband's and Wife's incomes. Another result of this arrangement was that Husband was able to accumulate a large amount of teacher's retirement benefits, which are his separate nonmarital property. Additionally, Husband's significant misconduct created a financial and emotional burden on the marriage. Although under the circumstances of this case the trial court could have chosen to grant Wife's request for maintenance, the trial court denied Wife maintenance on the basis that Wife had sufficient property, including marital property awarded, to provide for her reasonable needs. The trial court's division of marital property was just and equitable. Husband's claims of error regarding the division are denied.

8. The marital home, which was valued at $183,000, was awarded to Wife.

## V. Conclusion

The award of child support is reversed and the cause is remanded for the trial court to enter a new award of child support in accordance with this opinion and to specify the amount of credit Husband is to receive against the entire retroactive child support award. The judgment is affirmed in all other respects.

All concur.